**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 16-cr-174 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| BATMAGNAI CHOGSOM and | ) | |
| NIKOLAY TANTCHEV | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Nikolay Tantchev has moved for a judgment of acquittal or, in the alternative, for a new trial. Defendant Batmagnai Chogsom has moved for a judgment of acquittal. For the reasons explained below, the Court denies Defendants' motions.

## BACKGROUND

On March 16, 2016, a grand jury returned an indictment (the "Indictment") against Nikolay Tantchev ("Tantchev") and Batmagnai Chogsom ("Chogsom"). Specifically, Counts One and Five charged Defendants and Count Three charged only Tantchev with knowingly exporting and attempting to export a stolen motor vehicle outside the United States, in violation of 18 U.S.C. § 553. Count Two charged Defendants and Count Four charged only Tantchev with knowingly and willfully using false writings and documents in a matter within the jurisdiction of the United States Department of Homeland Security when he furnished the agency with false information regarding the contents of certain shipping containers, in violation of 18 U.S.C. § 1001(a)(3). Count Six charged Chogsom with knowingly and willfully making materially false, fictitious, and fraudulent statements in a matter within the jurisdiction of the Internal Revenue Service ("IRS") for stating to an IRS agent, when asked if he recognized the person in a photo of his sister, Burmaa Chogsom ("Ms. Chogsom"), that the person depicted in

the photo was "Jianmei Li," in violation of 18 U.S.C. § 1001(a)(2). Count Seven charged Tantchev with knowingly evading the reporting requirements of 31 U.S.C. § 5313(a) in structuring his financial transactions with two banks.

Defendants pled not guilty to all the Counts. Subsequently, Defendants proceeded to a six-day jury trial. (R. 72, R. 75, R. 76.) During the trial, the government called the following witnesses: Egle Kulbokas, Vice President of Operations at Atlantic Express; Juana Sanchez, a teller at Fifth Third Bank; U.S. Customs and Border Protection Agent Alfredo Rivera, Jr.; IRS Agent Jason Gibson; IRS Agent Antonino Bondi; Jarjrlsaikhan Tudev, an employee at the Anglo Freight Company; Ryan Christopher Lee; John Dagostinos; Marlene Figueroa; Michael Maleta; Christopher Dick; Oz Mizrahi; Pamela Posta; Chuluunbaatar Oidov; Boldbaatar Chuluunbaatar; Marek Loza; Dolkhuu Davaasambuu; Bayarjargal Sodnom; Munkhbat Ochirbat; Nicole Gustafson; Gerelt Dashdorj; Joyce Ballard; Deborah Pop; Mendsaikhan Dorj; Monica Ordaz; Nancy Hernandez; and Maria Mendez. Both Tantchev and Chogsom testified at trial.

On March 24, 2017, the jury returned a verdict of guilty against Tantchev on Counts One, Two, Three, Four, Five, and Seven of the Indictment. The jury returned a verdict of guilty against Chogsom on Count Six and a not guilty verdict on Counts One and Five. Tantchev now moves for a judgment of acquittal or new trial on all the counts for which he was convicted, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. Chogsom has similarly moved for a judgment of acquittal on Count Six.

## LEGAL STANDARD

### I.      Motion for a Judgment of Acquittal—Rule 29

Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any

offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

When, as here, a defendant makes a Rule 29(a) motion at the close of the government's case, and

the court reserves decision, the court "must decide the motion on the basis of the evidence at the

time the ruling was reserved." Fed. R. Crim. P. 29(b).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed,

nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see

also United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg*, 640

F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United

States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009). Indeed, a "defendant faces an uphill

battle in challenging the sufficiency of the evidence." *United States v. Orlando*, 819 F.3d 1016,

1021 (7th Cir. 2016). The reviewing court will view the "evidence in the light most favorable to

the prosecution," and the defendant "'must convince' the court that, even in that light, 'no

rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren*, 593 F.3d

at 546 (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United

States v. Rahman*, 805 F.3d 822, 836 (7th Cir. 2015). In other words, a court will "set aside a

jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,'

from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691,

704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see

also Warren*, 593 F.3d at 546.

It follows that under Rule 29, courts "do not reassess the weight of the evidence or

second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d

713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009).

This strict standard recognizes that "[s]orting the facts and inferences is a task for the

jury." *Warren*, 593 F.3d at 547. The Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61

L. Ed. 2d 560 (1979)).

## II.     Motion for a New Trial—Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the

defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires." Fed. R. Crim. P. 33(a); *see also United States v. Berg*, 714 F.3d 490, 500

(7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district

court's order on a Rule 33 motion for abuse of discretion); *United States v. McGee*, 408 F.3d

966, 979 (7th Cir. 2005). "'[C]ourts have interpreted [Rule 33] to require a new trial in the

interests of justice in a variety of situations in which the substantial rights of the defendant have

been jeopardized by errors or omissions during trial.'" *United States v. Eberhart*, 388 F.3d 1043,

1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir.

1989)), *overruled on other grounds*, 546 U.S. 12 (2005).

"'A . . . verdict in a criminal case is not to be overturned lightly,'" however, "'and

therefore a Rule 33 motion is not to be granted lightly.'" *Eberhart*, 388 F.3d at 1048

(quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). The court "may grant a new

trial if the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required

in the interest of justice.'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The

focus in a motion for a new trial is not on whether the testimony is so incredible that it should

have been excluded.  Rather, the court considers whether the verdict is against the manifest

weight of the evidence, taking into account the credibility of the witnesses."); *see also United

States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).  In other words, "[t]he court should grant

a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such

that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486

F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir.

1989)); *see also Presbitero*, 569 F.3d at 706.

## ANALYSIS

### I.     Chogsom's Motion for a Judgment of Acquittal

In order to prove Chogsom guilty of violating U.S.C. 1001(a)(2), the government had to

prove the following elements beyond a reasonable doubt: (1) Chogsom made a statement; (2) the

statement was false; (3) the statement was material; (4) Chogsom made the statement knowingly

and willfully; and (5) the statement concerned a matter within the jurisdiction of a federal

agency." *United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006); (R. 77, Jury Instructions

27.)  The parties do not dispute that when IRS Agent Jason Gibson asked Chogsom if he

recognized the person in a photo of his sister, Burmaa Chogsom ("Ms. Chogsom"), he told

Gibson that the person depicted in the photo was "Jianmei Li."  Chogsom, however, argues that

he is entitled to a judgment of acquittal because this statement, although possibly incomplete,

was not false because Ms. Chogsom took the name Jianmei Li upon immigrating to the United

States and thus Chogsom had merely provided Gibson with Ms. Chogsom's "American name."

Chogsom contends that his answer was analogous to a witness providing an individual's nickname or "street name" when asked, "Who is this person?"

Despite Chogsom's arguments, the government provided sufficient evidence at trial from which the jury could reasonably find Chogsom guilty beyond a reasonable doubt, especially "bearing in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) (quotations and citations omitted). Here, IRS Agent Gibson testified that in 2011, he was investigating Tantchev's cash deposits and he sought to identify an account holder named "Jianmei Li." (Tr. 779, 781.) Gibson obtained Li's Illinois Secretary of State photograph (the "photograph"), and he first interviewed Chogsom's nephew, Gerelt Dashdorj, who told Gibson that the woman in the picture was Burmaa Chogsom. (*Id.* 541, 544, 799-800, 803.) Gibson then interviewed Defendant Chogsom and showed him the photograph. (*Id.* 805, 890.) Chogsom told Gibson that the woman in the photograph was Jianmei Li, who used to work with him at a trucking company. (*Id.* 805-06.) When Gibson asked if he had a sister named Burmaa, Chogsom said that Burmaa did not work with him and was in Mongolia at the time. (*Id.* 806.)

Chogsom also testified at trial and the jury was able to evaluate his credibility and his state of mind at the time of Gibson's interview. Chogsom testified that he told the IRS agents that the woman in the photograph was "Jianmei Li," and that he did so in part because he "didn't want to – my sister get in trouble with that immigration – with her immigration status." (*Id.* 1290.) On cross-examination, Chogsom admitted that when his sister first came to the United States, she used her real name—Burmaa Chogsom, and that she only started using the name Jianmei Li when she acquired a government ID over a year later. (*Id.* 1351-52.) Chogsom also

admitted that Burmaa Chogsom was his sister's "real name"—the name her parents gave her when she was born.  (*Id.* 1356.)  Chogsom also testified that when Agent Gibson showed him a picture of his sister, he recognized his sister and understood Gibson's question, and he told Gibson that the person in the picture was Jianmei Li.  (*Id.* 1358-60, 1361, 1367-68.)

Viewing the evidence in the light most favorable to the government, a rational trier of fact could easily have found that Chogsom knowingly and willfully made a materially false statement in connection with a matter within the jurisdiction of a federal agency.  It is undisputed that Chogsom knowingly and willfully made a statement and that the statement concerned a matter within the jurisdiction of a federal agency—the IRS.  The statement was also material as it directly related to IRS Agent Gibson's investigation into Tantchev's cash deposits and his efforts to identify an account holder named "Jianmei Li."  (Tr. 779, 781.)

As to the falsity of Chogsom's statement, Chogsom himself testified that he viewed the photograph, knew the person in the photograph was his sister, Burmaa Chogsom, and told IRS Agent Gibson that the person's name was Jianmei Li in part because he did not want to get his sister in immigration trouble.  Chogsom also told Gibson that his sister, Burmaa had been in the United States, did not work for him, and was in Mongolia at the time of the interview.  (*Id.* 806.)  While Chogsom claims that he told Gibson the person in the photograph was Jianmei Li because that was the name his sister was using in America, given the evidence at trial, including Chogsom's testimony that his sister originally went by her given name when she came to the United States, the jury could reasonably have determined that Chogsom's explanation was not credible and that he provided the alias Jianmei Li and not his sister's "real name" because he wanted to avoid immigration problems.  *See United States v. Gorman*, 613 F.3d 711, 716 (7th Cir. 2010) ("What meaning [the defendant] ascribed to the [agent's] question and whether his

denial was knowingly false were questions within the jury's province."); *United States v. Jarrett,* 447 F.3d 520, 530 (7th Cir. 2006) ("But a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . .").

Chogsom relies heavily on *Rahman*, 805 F.3d 822, in which the Seventh Circuit found that there was insufficient evidence that the defendant had made a false statement pursuant to 18 U.S.C. § 1001. In that case, the defendant was charged with making a false statement in connection with an arson investigation when he was asked about the location of his laptop computer with business records and he told the investigator that it was located inside his restaurant. *Id.* at 837-38. Investigators later found a laptop computer in his home that did not contain business records. *Id.* The defendant provided evidence at trial that he had two laptop computers and that the computer with business records was separate from the computer found in his home, and was in fact in his restaurant at the time of fire. *Id.* at 838. The defendant testified that he had understood the agent's questions to be about the computer with his business records, and accordingly, he only mentioned the laptop in the restaurant. *Id.* The court reversed the defendant's conviction for making a false statement because the defendant had two computers and the defendant answered the agent's question truthfully by telling him the location of his laptop computer that contained business records. *Id.* at 839.

This case, however, is distinguishable from *Rahman*. Unlike in *Rahman*, here, Chogsom understood Agent Gibson's question and he was not confused about who Gibson was asking to him to identify. Chogsom knew that the person in the picture was his sister, Burmaa Chogsom, and given the evidence and his testimony, a rational trier of fact could reasonably have concluded that Chogsom intentionally provided his sister's American alias instead of her "real name" to mislead Gibson about her true identity and avoid problems with her immigration status.

The record here thus stands in contrast to *Rahman* where the evidence showed that the defendant may have been legitimately confused about which computer the agent was asking about and truthfully identified the laptop that he believed was relevant to the agent's investigation.

Here, viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to reasonably conclude that Chogsom knowingly and willfully made a material false statement, and accordingly, the Court denies Chogsom's motion for a judgment of acquittal. *See Gorman*, 613 F.3d at 716 (7th Cir. 2010) (affirming denial of motion for acquittal on false statement conviction and finding that it was "within the jury's province" to determine how the defendant understood the investigator's question and whether his answers were knowingly false).

## II.     Tantchev's Motion for a Judgment of Acquittal

### A.  Exporting Stolen Vehicles—Counts One, Three, and Five

Tantchev first moves for a judgment of acquittal on his convictions for exporting and attempting to export stolen vehicles—Counts One, Three, and Five.[1]  In order to prove that Tantchev exported and attempted to export stolen vehicles in violation of 18 U.S.C. § 553(a)(1), the government had to prove the following elements beyond a reasonable doubt: (1) Tantchev attempted to export or did export the motor vehicle described in the particular count in the Indictment; (2) the motor vehicle was stolen; and (3) when Tantchev attempted to export or did export the motor vehicle, he knew that it was stolen.  *United States v. Collazo-Martinez*, 880 F.2d 1496, 1497 n. 1 (1st Cir. 1989); (Jury Instructions 15, 17.)  Tantchev does not dispute that

---

[1] Although Tantchev's brief states that he has moved for a judgment of acquittal "on each of the three counts of conviction," Tantchev was in fact convicted on six Counts (Counts One, Three, and Five for exporting stolen vehicles, Counts Two and Four for using false writings, and Count Seven for structuring transactions).  (R. 79, Jury Verdict.)  Tantchev's motion for a judgment of acquittal only addresses the exporting stolen vehicles Counts and the structuring Count, so the Court only addresses those Counts in this Opinion.

he exported and attempted to export stolen motor vehicles, but he argues that the government did not provide sufficient evidence that Tantchev knew that there were stolen vehicles in his shipping containers, and thus failed to prove the knowledge element of the offense.

Despite Tantchev's argument, the government provided sufficient evidence at trial from which the jury could reasonably find Tantchev knew, or deliberately avoided knowing,[2] that there were stolen vehicles in his shipping containers.  At trial, as part of his lack of knowledge defense, Tantchev testified on direct examination that he was not involved in preparing the commercial invoices and packing lists that described the contents of the shipping containers. (Tr. 975-76.)  On cross-examination, Tantchev admitted that he filled out some of the paperwork to give to Atlantic regarding the containers, but he claimed that he merely gave Atlantic the information he received from customers about the contents of the containers.  (*Id.* 1170-73.) Egle Kulbokas, Atlantic's general manager, testified, however, that Tantchev personally provided completed commercial invoices and packing lists to Atlantic for each of the shipping containers containing stolen vehicles.  (*Id.* 1384-88.)  Kulbokas' testimony thus directly contradicted Tantchev's testimony.  Based on this contradiction, a reasonable jury could find that Tantchev was not credible, and that he was in fact lying both about not preparing the commercial invoices and packing lists and about not knowing what was in the shipping containers. *Jarrett,* 447 F.3d at 530 ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . .").  This is especially true in light of the liability Tantchev had for the contents of the containers, as discussed in the next section.  Accordingly, viewing the evidence in the light most favorable to the government, a "rational trier of fact" could have found Tantchev's claims about

---

[2] As discussed more fully below, the Court properly gave the "ostrich" instruction, which allowed the jury to find that Tantchev acted knowingly if the jury found beyond a reasonable doubt that Tantchev had a strong suspicion that the vehicles he was exporting and attempting to export were stolen and that he deliberately avoided the truth.

his lack of knowledge implausible and found that he did in fact have knowledge of the stolen vehicles in his shipping containers. *Moore*, 572 F.3d at 337; *Presbitero*, 569 F.3d at 704 (to win on a motion for acquittal the record must contain "no evidence, regardless of how it is weighed, from which a jury could have returned a conviction").

The jury also could have reasonably found that Tantchev deliberately avoided discovering the stolen vehicles and thus still found him guilty. Specifically, the government showed that if Tantchev did not look in the containers, he deliberately did not do so despite the fact that there were many potential safety issues associated with loading and shipping the containers and the fact that he was responsible for any liability and viewed it as his job to make sure the cargo was shipped safely. (Tr. 924-35, 959, 967, 1132-36, 1136-37, 1139-40.) Although Tantchev denied knowing what was in the containers and stated that he trusted his customers to provide information about the contents of the containers, Tantchev conceded during his testimony that he allowed these customers to come to his truck yard and load his containers even though they were effectively "strangers." (*Id.* 1136-37.) The government also provided evidence that Tantchev personally contacted Atlantic Express, the freight forwarding company Tantchev used to ship the containers, to deliver shipping containers to his truck yard. (*Id.* 31-33.) Additionally, despite Tantchev's claims that he did not make representations to Atlantic about what was in the containers, as noted above, Kulbokas testified that Tantchev personally provided completed commercial invoices and packing lists to Atlantic for each of the shipping containers containing stolen vehicles, despite the fact that Tantchev admitted he never looked inside the containers and relied entirely on his customers' representations about the contents of the containers. (*Id.* 1384-88.)

Viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to reasonably conclude that Tantchev's testimony was not credible and that he either knew that there were stolen vehicles in his containers or that he deliberately avoided learning that there were stolen vehicles in his containers. Accordingly, the Court denies Tantchev's motion for a judgment of acquittal as to Counts One, Three, and Five. *See Jarrett*, 447 F.3d at 530 ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . .").

### B. Structuring Transactions—Count VII

Tantchev has also moved for a judgment of acquittal on his conviction for structuring currency transactions—Count Seven. In order to prove that Tantchev illegally structured currency transactions, the government had to prove the following elements beyond a reasonable doubt: (1) Tantchev had knowledge that Fifth Third Bank and J.P. Morgan Chase Bank are required to report currency transactions in amounts greater than $10,000; (2) Tantchev structured currency transactions for the purpose of evading this reporting requirement; and (3) the transactions involved one or more domestic financial institutions. *United States v. Aljabri*, 363 F. App'x 403, 407 (7th Cir. 2010); (Jury Instructions 34.) Tantchev does not dispute that he made several deposits at the $10,000 limit or just below, but he argues that the government did not provide sufficient evidence that he made the deposits for the purpose of avoiding the reporting requirements.

Here, the government provided sufficient evidence at trial from which the jury could easily find that Tantchev knew that banks had to report transactions over $10,000 and that he structured his deposits with the express purpose of avoiding that reporting requirement. Specifically, Tantchev testified that he knew that banks were required to report deposits over

$10,000. (Tr. 1212.) Nancy Hernandez, a former teller at Fifth Third Bank, also testified that Tantchev came in "very frequently" to make large cash deposits that were under $10,000, and that in total, he made 72 deposits into various accounts in amounts just under the $10,000 limit. (*Id.* 662-67, 672, 689-92.) As the Seventh Circuit has consistently held, this evidence of repeated transactions just below $10,000 is sufficient evidence of intent to structure. *See United States v. Malewicka*, 664 F.3d 1099, 1109–10 (7th Cir. 2011) ("repeated transactions below $10,000 are evidence of intent to structure"); *United States v. Cassano*, 372 F.3d 868, 878–79 (7th Cir. 2004), *vacated on other grounds,* 543 U.S. 1109 (2005) (citing *United States v. Booker*, 543 U.S. 220 (2005)) ("[I]it is unlikely, to the point of absurdity, that it was pure coincidence that all fifty-one checks cashed by [defendant] were in denominations under $10,000.").

In sum, viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to reasonably conclude that Tantchev was aware of the $10,000 reporting requirement and intentionally structured his transactions to avoid triggering the reporting requirement. Accordingly, the Court denies Tantchev's motion for a judgment of acquittal on Count Seven.

## III.   Tantchev's Motion for a New Trial

### A.  Ostrich Jury Instruction

Tantchev challenges the Court's "ostrich" or "deliberate avoidance" jury instruction, which stated:

> "With respect to Counts One, Three, and Five you may find that the defendant you are considering in each Count acted knowingly if you find beyond a reasonable doubt that he had a strong suspicion that the vehicles in the containers he was exporting and attempting to export in those Counts were stolen and that he deliberately avoided the truth.

With respect to Counts Two and Four, you may find that the defendant you are considering in each Count acted knowingly if you find beyond a reasonable doubt that he had a strong suspicion that the documents and information he caused to be filed with the Bureau of Customs and Border Protection regarding the vehicles in the containers he was exporting and attempting to export in Counts One and Three contained materially false, fictitious, or fraudulent statements or entries, and that he deliberately avoided the truth.

You may not find that the defendant acted knowingly if he was merely mistaken or careless in not discovering the truth, or if he failed to make an effort to discover the truth."

(R. 77, Jury Instructions 33.)  Tantchev argues that the Court gave the instruction in error because the government did not introduce sufficient evidence that Tantchev believed it was likely that the shipping containers contained stolen vehicles and deliberately avoided learning that fact to warrant giving the instruction.  Tantchev also argues that the instruction prejudiced him because the government argued in closing that Tantchev's failure to look inside the shipping containers showed that he was deliberately avoiding learning about the stolen vehicles.

To obtain a new trial based on incorrect jury instructions, Tantchev must establish that "(1) the instructions did not accurately state the law, and (2) the error prejudiced [him] because the jury was likely to be misled or confused."  *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 733 (7th Cir. 2013).  The Seventh Circuit has explained that the ostrich instruction is properly used to "inform jurors that the legal definition of 'knowledge' includes the deliberate avoidance of knowledge.  *United States v. Pabey*, 664 F.3d 1084, 1092 (7th Cir. 2011) (citation omitted).  Essentially, the instruction prevents a defendant from avoiding "criminal liability by sticking his head in the sand to purposefully avoid the knowledge that he is involved in criminal dealings."  *Id.* (citing *United States v. Green*, 648 F.3d 569, 582 (7th Cir. 2011).  The Seventh Circuit has cautioned, however, that evidence "merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support

14

an inference that a particular defendant was deliberately ignorant." *United States v. Carrillo,* 435 F.3d 767, 782 (7th Cir. 2006).  Accordingly, the ostrich instruction is only appropriate when: "(1) a defendant claims a lack of guilty knowledge and (2) the government presents evidence that suggests that the defendant *deliberately* avoided the truth." *Pabey*, 664 F.3d at 1092 (citing *United States v. Tanner,* 628 F.3d 890, 904 (7th Cir. 2010) (emphasis in original).  When determining whether an ostrich instruction was appropriate, the Seventh Circuit views the evidence in the light most favorable to the government.  *United States v. Pierotti*, 777 F.3d 917, 920 (7th Cir. 2015).

Tantchev has claimed a lack of guilty knowledge, so the government was required to present evidence that the defendant deliberately avoided the truth.  "There are two types of evidence that can illustrate a defendant's deliberate attempts to remain ignorant." *Id.* (citing *Carrillo,* 435 F.3d at 780).  First, "a prosecutor can show that the defendant committed overt physical acts to avoid the knowledge." *Id.*; *see e.g.*, *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990) (finding ostrich instruction warranted where landlord changed his route to work to avoid driving past suspicious tenants).  Second, the prosecutor can show "purely psychological avoidance, otherwise described as the cutting off of one's normal curiosity by an effort of will." *Pabey*, 664 F.3d at 1092 (quoting *Carrillo,* 435 F.3d at 780).  The Seventh Circuit has held that a jury can "infer the deliberate avoidance of knowledge from circumstantial evidence alone," such as a defendant consistently ignoring red flags.  *Id.* at 1093 (citing *Carrillo,* 435 F.3d at 781).  Accordingly, the "key determinations to make when examining this type of evidence are therefore what the defendant knew and whether that knowledge raises a reasonable inference that [he] remained deliberately ignorant of facts constituting criminal knowledge." *Id.* (citations and quotations omitted).

Here, the ostrich instruction was warranted because the government produced sufficient evidence that Tantchev deliberately avoided learning the truth about the stolen vehicles in his shipping containers—specifically, the government showed that Tantchev cut off his normal curiosity by an effort of will. On direct examination, Tantchev claimed that he did not know there were stolen vehicles in his shipping containers because his customers loaded the containers and he deliberately never looked inside the containers. (Tr. 924-35, 959, 967.) On cross-examination, Tantchev conceded that he only had verbal agreements with his customers and that as the shipper of the containers, he bore the ultimate liability risk for the containers and the materials inside the containers. (*Id.* 1132-36.) Tantchev also admitted that he specifically avoided being present when his customers—many whom he did not know and who were effectively strangers—came to his truck yard and loaded the containers, despite the fact that he had over a decade of experience shipping containers, safety was a "paramount issue" in his business, there were many potential safety issues associated with loading and shipping the containers, and he was responsible for any liability and viewed it as his job to make sure the cargo was shipped safely. (*Id.* 1136-37, 1139-40.) Tantchev conceded that because he did not check the containers to ensure they were properly loaded, the loads in his containers, for which he was responsible, might be unsecured and "bouncing all over the place" and "causing some damage," and he would not know. (*Id.* at 1137-38.)

This evidence sufficiently demonstrated that Tantchev deliberately avoided exhibiting normal curiosity and safety and liability-related caution as to the contents of the shipping containers in his truck yard, especially for someone with years of experience in the transportation industry. The Court's jury instruction, which closely tracks the pattern jury instruction in this Circuit, was thus appropriate based on the evidence in this case. *See Pabey*, 664 F.3d at 1093-94

16

(finding deliberate avoidance where defendant avoiding asking questions of or talking to his friends who were working illegally on his house); *United States v. Leahy,* 464 F.3d 773, 794 (7th Cir. 2007) (finding deliberate avoidance where defendant, an insurance broker for a temp agency, asked no questions about the company's auditing problems despite his exposure to "numerous red flags, obvious to someone with his training and experience"); *see also* Pattern Criminal Jury Instructions of the Seventh Circuit (2012 ed.) § 4.10.

Accordingly, the Court denies Tantchev's motion for a new trial due to the Court's "ostrich" jury instruction.

### B. Government's References to Bank Manager Malfeasance

At the end of the government's case, Juana Sanchez, a bank teller at Fifth Third Bank where Tantchev was a frequent business customer, testified regarding the bank's policy requiring a person wiring money to come to the bank and show identification. (Tr. 726-27, 767.) She testified that the branch manager, Jaime Valdez at the time Tantchev was doing business with the bank, and the banker, Myra Ramundo, were responsible for enforcing that policy and it would be their fault if the bank initiated a wire transfer without a person showing identification. (*Id.* 767-68, 773.) She also testified that the bank fired Ramundo and Valdez. (*Id.* 769-71.) The Court did not allow Sanchez to testify regarding why the bank fired Ramundo and Valdez due to sustained hearsay objections and because the government could not lay the proper foundation for such testimony. (*Id.* 768-771.) Despite these limitations on Sanchez's testimony, in its closing argument, the government stated, "you heard from Ms. Sanchez that her supervisors back at that time at Fifth Third Bank were both fired for malfeasance." When the government made this statement in its closing argument, Tantchev objected on the ground that it "was stricken as hearsay," and the Court reminded the jury that it should not consider any evidence that the Court

had previously struck from the record.  (*Id.* 1525-26.)  The government did not mention this topic again in its closing.

Tantchev argues that the government was impermissibly implying in its closing argument that Tantchev avoided the bank's wire transfer identification policy and arranged for wire transfers from the accounts of individuals who were not present because he was colluding with dishonest bank supervisors despite not introducing any evidence that the bank fired Ramundo and Valdez for malfeasance.  Tantchev claims that while the Court did remind the jury that it should not consider anything stricken from the record, the Court never explicitly struck the government's statement about "malfeasance" from the record, and thus the Court's instruction may not have cured this impermissible argument.  Tantchev argues that this error was prejudicial because it allowed the jury to infer that Tantchev was able to illegally structure his transactions, in contravention of bank policy, with the assistance of corrupt bank supervisors, and accordingly the Court should grant a new trial.

While Tantchev is correct that the government's mention of bank supervisor malfeasance was inappropriate because there was no evidence of any such malfeasance entered at trial, a new trial is not warranted here.  A court's analysis of improper prosecutorial comments during closing arguments requires "first a determination that prosecutors acted improperly, and second a conclusion that the improper conduct prejudiced the defendant."  *United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013) (citations omitted).  To determine that the government's improper statement prejudiced Defendant Tantchev, the Court must weigh the following factors: "(1) whether the prosecutor misstated the evidence; (2) whether the statements implicate a specific right of the defendant; (3) whether the defense invited the prosecutor's remarks; (4) the trial

court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut." *Richards*, 719 F.3d at 766.

Here, even though the government's brief reference to malfeasance was improper, it did not prejudice Tantchev. While the government did misstate the evidence and the defense did not invite those remarks, the other factors favor the government. The government only stated that the bank had fired the supervisors for malfeasance and did not argue any inference against Tantchev based on that statement. Moreover, there was substantial additional evidence to support Tantchev's structuring conviction. The government introduced evidence that Tantchev deposited, in several small transactions under $10,000 and $20,000, hundreds of thousands of dollars into bank accounts held by various individuals, including Kosta Bonev, Yu Li, Otgonbayar Jigmidsambu, and Jianmei Li. (*Id.* 1046-53.) The government was also able to show that there were several wire transfers made from these accounts to several foreign accounts in Bulgaria, despite the fact that, when some of the transfers were made, the named account holders were not in the United States. (*Id.*; *see also id.* 1055; 1074-79; 1088-89.)

Given this evidence, as well as the fact that Tantchev quickly objected to the government's single, brief reference to malfeasance in a nearly two hour closing argument and that the Court promptly reminded the jury not to consider any evidence the Court had struck from the record, when considered in the context of the entire record, the Court finds that any potential prejudice here was minimal and does not warrant a new trial. *United States v. Lopez*, No. 16-2269, 2017 WL 3709024, at *4 (7th Cir. Aug. 29, 2017) (upholding denial of motion for new trial because there was significant of evidence of defendant's guilt and the government only made two minimally prejudicial comments in closing) (citing *United States v. McMath*, 559 F.3d 657, 667 (7th Cir. 2009) ("As a general matter, improper comments during closing arguments

rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel.")

Accordingly, the Court denies Tantchev's motion for a new trial due to the government's references to other stolen vehicles

### C.  Government's References to Other Stolen Vehicles

On direct examination, Tantchev testified that after Customs and Border Protection identified two of the shipments containing stolen vehicles charged in the Indictment, agents began examining all his containers that were in transit at the time, and he learned that a third container had a problem as well.  (Tr. 971-72.)  Tantchev further testified that other than those three containers, there were no other problems with the rest of his containers that were inspected. (*Id.* 972.)  On cross-examination, the government attempted to introduce evidence of two other containers that contained stolen vehicles to impeach Tantchev's testimony on direct. Specifically, on cross-examination, when Tantchev reiterated that there were no problems with the rest of his containers, to refresh his memory for purposes of impeachment, the government showed Tantchev documents indicating that Customs agents identified two other containers that had stolen vehicles.  (*Id.* 1155-56, 1159-60.)  The documents were not read into evidence, but the government did state twice in introducing them that they involved "stolen vehicles."  (*Id.* 1160, 1162.)  After refreshing his recollection, Tantchev conceded that two other shipments had "problems" with Customs as well.  (*Id.* 1166-68.)  This evidence directly impeached his earlier testimony.

Tantchev first argues that the government's entire line of questioning was impermissible because the documents relating to problems with the two other containers did not relate to the Customs' inspections that resulted from the discovery of the initial containers containing stolen

vehicles.  Accordingly, Tantchev argues that the government should not have been able to

impeach Tantchev broadly about whether there were problems with any other containers he

shipped because he only stated that there were no problems resulting from the Customs'

inspection that followed the discovery of the initial stolen vehicles.  Tantchev further argues that

even if the line of questioning was permissible, the government's reference to "stolen vehicles,"

was improper and extremely prejudicial.  Although the Court sustained Tantchev's objection to

the government's reference to "stolen vehicles" and instructed the jury that comments from

lawyers are not evidence, Tantchev argues that the prejudice from this impermissible line of

question was so great that the Court must order a new trial.

Despite Tantchev's arguments, the government's line of questioning was permissible for

purposes of impeachment.  On direct examination, Tantchev testified that after Customs

identified the containers with the stolen vehicles charged in this case in February and March

2011, there were no problems with the rest of his containers.  (*Id.* 971-972.)  This testimony and

broad denial sufficiently opened the door for the government to ask Tantchev whether there were

problems with any other containers in that time period—February and March 2011—when he

testified that Customs examined all his containers.  It was thus permissible for the government to

impeach him by showing him documents, which were not entered into evidence, relating to two

other shipping containers that Customs had inspected in February and March 2011 and found to

contain stolen vehicles because those documents directly contradicted Tantchev's broad

statement on direct that Customs had not identified any other problems with his shipping

containers in that time period.  *United States v. Kohli*, 847 F.3d 483, 492–93 (7th Cir.

2017), *reh'g and suggestion for reh'g en banc denied* (Mar. 27, 2017) (explaining that collateral

subject matter may be subject of impeachment on cross-examination when subject is discussed

on direct and allowing impeachment of defendant's contradictory statements on direct where government did not offer extrinsic documents into evidence); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425 n.12 (7th Cir. 2015) ("the collateral evidence rule does not . . . limit the scope of all types of impeachment by cross-examination," but "merely precludes extrinsic evidence of certain facts that would impeach by contradiction"). Accordingly, the government's line of impeachment questioning was not improper.

The Court finds that the government's two references to "stolen vehicles" certainly do not warrant a new trial. While the government did reference stolen vehicles in the jury's presence, the Court quickly sustained Tantchev's objections to those references and the government did not mention the additional stolen vehicles in its closing argument. Given the limited references to stolen vehicles, and the Court's jury instruction that comments from attorneys are not considered evidence, the Court denies Tantchev's motion for a new trial. (*See* Jury Instructions 6) ("The lawyers' statements and arguments are not evidence. . . The lawyers' questions and objections likewise are not evidence.")

## CONCLUSION

For the foregoing reasons, the Court denies Chogsom's motion for a judgment of acquittal and Tantchev's motion for a judgment of acquittal and for a new trial.

**Dated:** October 6, 2017

_____
AMY J. ST. EVE
United States District Court Judge